UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

DEMARIO THOMAS #535083     CIVIL ACTION NO. 17-cv-0324

VERSUS     CHIEF JUDGE HICKS

DARRYL VANNOY, ET AL     MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

A Caddo Parish jury convicted DeMario Thomas ("Petitioner") of second-degree murder in connection with a robbery committed by Petitioner and his cousin, during which the victim was killed. Petitioner challenged the sufficiency of the evidence on direct appeal, and the state court affirmed. State v. Thomas, 181 So.3d 789 (La. App. 2d Cir. 2015), writ denied, 186 So.3d 1178 (La. 2016). Petitioner now seeks federal habeas relief on the sufficiency of the evidence claim. For the reasons that follow, it is recommended that his petition be denied.

**Relevant Facts**

Gregory Scott Bowers lived in the Plantation Inn on Greenwood Road in Shreveport. He was found dead in his room, having been stabbed 50 times. His room had been ransacked, and one of his vehicles was missing.

Petitioner's aunt and mother both worked at the motel and were friends with the victim. They saw Petitioner soon after the murder, and he was wearing two chains that looked similar to chains that the victim owned. They asked Petitioner what he knew about

the murder, and he did not give them a definitive answer. They also saw Akeem Harvey, who was wearing a necklace that appeared similar to one owned by the victim. Another family member turned over a bag that contained a camera and watch that Petitioner's mother recognized as belonging to the victim. The mother and aunt turned over the bag and information to a detective and said that they thought Petitioner knew something about what happened.

Akeem Harvey admitted to police that he knew Petitioner and received jewelry from him. Detectives found gold chains that had been thrown into the trash can outside of Harvey's home, and there were more gold chains in a black bag in his bedroom dresser.

Petitioner was arrested and photographed. The pictures showed that he had cuts on his hands. The physician who performed the autopsy testified at trial that the cuts shown in the photograph were consistent with an assailant using a knife that became bloody and slippery, causing the blade to go up and cut the palm of the hand.

The victim's vehicle was found two or three miles from the crime scene. Police found the fingerprint of a black female on the passenger door, and they found the print of Petitioner's cousin, Kendrick Thomas, on the left side of the trunk. Petitioner's prints were not found in the car.

The police officer who conducted the crime scene investigation of the motel room found signs of a struggle and a blood-stained open Smith & Wesson lock-blade knife. The crime lab performed DNA tests on items seized in the investigation and compared them to reference samples of the victim, Petitioner, Akeem Harvey, and Kendrick Thomas.

Blood on an end table in the victim's room was consistent with the reference sample from Petitioner. He also could not be excluded as the major contributor of a DNA mixture found in a swab of blood on another table in the room. The probability that the major contributor was someone other than Petitioner was 1 in 169 quadrillion.

Blood stains on the knife were also tested. The swab from one side of the handle was consistent with being a mixture of DNA from at least two persons, and Petitioner, the victim, and Kendrick could not be excluded. Approximately 96.4% of the population could be excluded. The familial relationship between Kendrick and Petitioner made it more challenging to identify the donor.

A second test area of the knife was consistent with being a mixture of DNA from two persons, a major and at least one minor contributor. Kendrick Thomas and Petitioner could not be excluded as being the minor contributor, but 99.9% of the population could be excluded. A third test area from the other side of the handle was consistent with being a mixture of DNA from at least two persons, one major and one minor contributor. Petitioner could not be excluded as the major contributor, and the probability that the major contributor was someone other than him was 1 in 3.07 quadrillion. Thomas and Harvey were excluded as donors of the DNA.

Petitioner was advised of his <u>Miranda</u> rights and elected to give a recorded interview. The recorded interview was played for the jury at trial, and jurors were allowed to follow along on a transcript. The court reporter did not transcribe the recording as part of the trial record, and the State reports that the record does not contain the transcribed copy of the statement. Doc. 28, p. 6 n. 1; Tr. 865-69. Thus, this court has not been

presented with either the recording of the interview or any transcript of it. Petitioner does not, however, challenge the state court's description of his interview statement.

The state appellate court, which apparently did have the benefit of the recording or the transcript, wrote in its opinion that Petitioner was asked if he was injured in an attack or while defending himself (referring to the cuts on his hands), and Petitioner responded "no." He went on to confirm his involvement in the robbery with his cousin, Kendrick Thomas, and claimed that it was Kendrick who stabbed the victim. There is testimony in the trial transcript that refers to the statement. The witness said that Petitioner said in his statement that he was there but "didn't stop it" and didn't touch the victim. Tr. 896. Petitioner is also said to have admitted in the statement that he rode in the victim's car with Kendrick. Tr. 897. Petitioner's statement was also described as being "littered with references about the robbery plan" and that Petitioner "confirms that this was a robbery." Tr. 897.

The defense called Dr. James Pinkston, a psychologist, as its sole witness. He testified that he evaluated Petitioner on his ability to distinguish right from wrong at the time of the offense, as well as his capacity to understand the proceedings. Dr. Pinkston administered general cognitive functioning, psychological, and legal competency tests. He assessed Petitioner as having mildly slowed mental processing, word finding problems, stuttering and mumbling. Cognitive functioning was in the low average to average range. Petitioner's ability to understand and use his words correctly fell in the borderline range, but Petitioner could follow simple instructions and make himself understood in a simple context. He can be confusing, and it is sometimes hard to understand what he means. Dr.

Pinkston ultimately found that Petitioner was both sane and competent. It was his opinion that when Petitioner said the crime was supposed to be a robbery, not a murder, the statement "sounds pretty clear" but was "confusing" when read as a whole and taken in context.

**State Court Decision**

Louisiana law defines second-degree murder as the killing of a human being (1) when the offender has a specific intent to kill or to inflict great bodily harm or (2) when the offender is engaged in the perpetration or attempted perpetration of certain felonies, including armed robbery. La. R.S. 14:30.1. All persons concerned in the commission of the crime, whether they directly commit the act, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. The jury was charged with these legal principles, as well as those applicable to lesser offenses. Tr. 618-22. The jury returned a unanimous verdict of guilty to second-degree murder. Tr. 951-54.

Petitioner's sole issue on direct appeal was a challenge to the sufficiency of the evidence. In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993). And "it is the responsibility of the jury—not the

court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).

The state appellate court reviewed the trial evidence in detail and applied the Jackson standard. The court noted that Petitioner admitted that he was involved in the robbery of the victim, but he claimed that his cousin committed the actual murder. The court reasoned that "[t]his admission, standing alone, constitutes sufficient evidence to prove that defendant was a principal to the crime of second-degree murder." State v. Thomas, 181 So.3d at 794. Petitioner's participation in the robbery that resulted in the victim's death was sufficient support for the conviction. Id. The appellate court also pointed to the evidence of Petitioner's DNA on the murder weapon, Petitioner's possession of jewelry that belonged to the victim, and the cut on Petitioner's hand. Id. at 794-95.

**Habeas Review**

The state court decided the merits of the sufficiency of the evidence claim on direct appeal. Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus, a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable

application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

**Analysis**

Petitioner argues that his conviction was based largely on circumstantial evidence, and there was no direct evidence that it was Petitioner who actually killed the victim. Circumstantial evidence may be used to support a conviction and withstand habeas review. Williams v. Cain, 408 Fed. Appx. 817 (5th Cir. 2011) ("This evidence, though circumstantial, is constitutionally sufficient to support the jury's conclusion that Williams committed the offenses."); US v. Reyes, 227 F.3d 263, 267 (5th Cir. 2000) ("In addition, we have repeatedly held that circumstantial evidence alone is adequate to support a conviction of conspiracy."); United States v. Johnson, __ Fed. Appx. __, 2019 WL 2237493, *3 (6th Cir. 2019) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."); and Brian Means, Postconviction Remedies, § 31:1 ("although mere suspicion and speculation cannot support logical inferences, circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction"). Beyond the circumstantial evidence in this case, there was Petitioner's own admission to his involvement in the crime.

Petitioner next argues that it was his cousin, Kendrick Thomas, who actually committed the murder. Thomas is said to have a history of violence, including murder, and Petitioner did not have such a history. Petitioner argues that he had every reason to want Mr. Bowers alive, as Bowers was helping Petitioner market his first music CD and

expected him to help produce and market a second CD. Nonetheless, Petitioner admitted his involvement in what he said was intended to be a robbery but resulted in the killing of the victim.

As the state court noted, the prosecution was not required to prove that Petitioner struck the fatal blows to support his conviction. Petitioner admitted to being a principal to the crime. Louisiana's felony-murder doctrine provides that a crime such as robbery may escalate into a second-degree murder even if that is beyond the original plan of the defendant or his accomplice who unexpectedly kills during the commission of the underlying felony offense. State v. Williams, 266 So.3d 485, 489 (La. App. 2d Cir. 2019). "[W]hen two or more persons embark on a concerted course of action, each person becomes responsible for not only his own acts, but also for the acts of the other, including deviations from the common plan which are the foreseeable consequences of carrying out the plan." Id.

Other examples of similar convictions being upheld are State v. Turner, 138 So.3d 740 (La. App. 5th Cir. 2014) (participant in robbery was guilty of second-degree murder when victim was killed, even though it was not proved he was the participant who inflicted the fatal wound); State v. Luther McFarland, 960 So.2d 1132 (La. App. 5th Cir. 2007) (even an accidental killing during aggravated burglary would support second degree murder conviction); and State v. Morris McFarland, 960 So.2d 1142 (La. App. 5th Cir. 2007) (principal to aggravated burglary was guilty of second degree murder when killing was done by co-defendant). Accordingly, Petitioner was guilty of second-degree murder even if Kendrick Thomas actually inflicted the stab wounds.

Petitioner also argues that the presence of his blood on the knife did not prove that he actually stabbed the victim or that Kendrick Thomas did not. Once again, Petitioner is focused on which of the two participants inflicted the fatal wounds. The State was not required to prove his guilt to that degree.

The evidence showed that Petitioner participated in the robbery, and the victim was killed by one or both of the robbers during the crime. That evidence was sufficient for the jury to return its verdict, and the state court's adjudication of the Jackson claim was entirely reasonable under these circumstances. The conviction easily withstands review under the doubly deferential standard of § 2254(d).

Accordingly,

It is recommended that Petitioner's Petition for Writ of Habeas Corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to

proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of August, 2019.

Mark L. Hornsby
U.S. Magistrate Judge